IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:22-CR-33-TAV-DCP |
| | ) | |
| MORICE ARMANI BROWN, and | ) | |
| MARKLYN ANTONIO FORRESTER, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the undersigned for report and recommendation on motions to suppress evidence stemming from a vehicle stop by Defendants Marklyn Forrester [Doc. 87] and Morice Brown [Doc. 89], both filed on June 30, 2023.  *See* 28 U.S.C. § 636(b).  Defendants are charged with conspiring to commit mail fraud by perpetrating a lottery scheme and with identity theft and aggravated identity theft [Doc. 82].  They challenge the stop of their vehicle and their arrest on October 22, 2021, on Fourth Amendment grounds [Docs. 87 & 89].

In late September 2021, the Lenoir City Police Department ("LCPD") began investigating a scheme to defraud an elderly Lenoir City resident S.C., who was told she had won a lottery but must pay various fees and taxes to receive her winnings.  S.C. paid out over $672,000 to her contacts "Richard" and "Lucky Graham" by mailing or wiring funds and, on one occasion in August 2021, delivering funds to a courier in the Walmart parking lot in Lenoir City. The LCPD formed a plan to catch the perpetrators by having S.C. arrange for a second meeting for a courier to pick up cash in the Walmart parking lot on October 22, 2021.  On that morning, undercover officers surveilling the parking lot observed a RAV4 driving slowly through the parking lot, leaving just before an attempt by "Richard" to change the meeting location, and

1

returning after S.C. declined the change.  A young black male collected the money from S.C., and when officers attempted to stop him, he fled in a Nissan Altima driven by another black male.  Once the courier fled, the RAV4 also attempted to leave but collided with a truck.  Officers arrested Defendants Forrester and Brown, the driver and passenger of the RAV4, and seized three cellular telephones.

Defendants seek to suppress all evidence seized from their vehicle and from their persons incident to their arrest, arguing law enforcement gained this evidence in violation of their Fourth Amendment rights.  Specifically, they contend that officers lacked reasonable suspicion to stop their vehicle in the parking lot and probable cause to arrest them.

For the reasons discussed below, the Court finds that officers had reasonable suspicion to conduct an investigatory stop of Defendants' vehicle and probable cause to arrest Defendants for financial exploitation of an elder.  The Court also finds that the cellphones were properly seized from the Defendants' vehicle incident to their arrest.  Accordingly, the Court respectfully recommends that the Defendants' motions to suppress evidence [Docs. 87 & 89] be denied.

## I.    BACKGROUND

Defendants Forrester and Brown are charged, along with Codefendants Tessa Hines ("Hines") and Jahmarley McFarlane ("McFarlane"), with conspiring to commit mail fraud from January 1, 2020, through December 10, 2021, in violation of 18 U.S.C. § 1341 (Count One) [Doc. 82 pp. 1–6].[1]  The Superseding Indictment describes a scheme to obtain money from an elderly person S.C. by sending a letter to S.C. representing that she won $3.5 million in a lottery

---

[1]    Codefendant Jamali Ramsay was also charged by Criminal Complaint [Doc. 1] and in the original Indictment [Doc. 40].  Defendant Ramsay entered a guilty plea on May 9, 2023 [Doc. 80, Minutes].  He is named but not charged in the Superseding Indictment [Doc. 82 pp. 4–5].  The Superseding Indictment alleges that Ramsay posed as a courier and traveled to Lenoir City to accept $80,000 in cash from S.C. on August 17, 2021 [*Id.* at 4].  He is also alleged to have driven McFarlane to and from the Walmart parking lot on October 22, 2021 [*Id.* at p. 5].

2

but must pay fees and taxes to get her winnings [*Id*. at 3]. Over a six-month period, Defendants are alleged to have sent other correspondence to S.C. and called her, posing as "Richard" and "Lucky Graham," to secure payments, causing S.C. to send them a total of $672,000 [*Id*. at 3–4]. Posing as "couriers," McFarlane and Jamali Ramsay ("Ramsay") accepted $80,000 from S.C. in person in her hometown of Lenoir City, Tennessee, on August 17, 2023 [*Id*. at 4]. Richard and Lucky Graham sought a second payment of $150,000, which S.C., who at this point had contacted the LCPD, insisted be made in person [*Id*. at 4–5]. Richard and Lucky Graham agreed to have couriers pick up the payment from S.C. on the morning of October 22, 2021, in the parking lot of the Lenoir City Walmart [*Id*. at 5].

Count One further alleges that Hines and Defendant Brown traveled from Jamaica to Florida on October 20, 2021, where they rented a car, picked up Defendant Forrester, and then together drove to Lenoir City arriving in the late evening of October 21, 2021, and staying in a hotel [*Id*.]. On October 21, 2021, McFarlane and Ramsay also drove from Florida to Lenoir City, arriving in the early morning of October 22, 2021 [*Id*.]. On the morning of October 22, 2021, McFarlane and Ramsay drove to the Lenoir City Walmart to meet with S.C. [*Id*.]. Defendants Brown and Forrester also drove to the Lenoir City Walmart, leaving Defendant Hines at the hotel [*Id*.]. Cellular telephone records reveal that Defendant Brown and McFarlane were communicating with each other and other coconspirators that morning by electronic message [*Id*. at 5–6]. McFarlane approached S.C.'s vehicle in the Walmart parking lot, accepted a package purported to contain $150,000, and fled in a car with Ramsay [*Id*. at 6]. Police stopped and arrested all four Defendants as they attempted to flee the parking area in their respective vehicles [*Id*.]. Hines was later arrested in the airport in Newark, New Jersey, as she was boarding a flight to Jamaica [*Id*.].

Defendants Brown and Forrester are charged in Count Two with identity theft of C.R. and in Count Three with aggravated identity theft of unspecified others [*Id*. at 7–8]. These offenses are alleged to have occurred from January 1, 2020, through October 22, 2021, which overlaps with the conspiracy alleged in Count One [*Id*. at pp. 1, 7–8]. Counts Two and Three both involve theft of social security numbers [*Id*.]. Count Three states that the stolen personal identifiers were used during a conspiracy to commit mail fraud. [*Id*. at 8].

On June 30, 2023, Defendant Forrester [Doc. 87] and Defendant Brown [Doc. 89] both filed Motions to Suppress, seeking to suppress all evidence seized from the stop of their vehicle, including the contents of their cellular phones. The Government responded in opposition on July 17, 2023 [Doc. 93]. On July 27, 2023, the Court held an evidentiary hearing on the motions [Doc. 97, Minutes]. During the hearing, the Court asked the parties to file post-hearing briefs to define the issues and to address Defendants' standing to contest the stop and search of a rental vehicle rented by a third party. Defendant Brown filed a post-hearing brief on August 23, 2023 [Doc. 107], and Defendant Forrester filed a post-hearing brief on August 24, 2023 [Doc. 108]. The Government filed a responding post-hearing brief on September 15, 2023 [Doc. 118]. On September 22, 2023, Defendant Brown timely filed a reply brief [Doc. 121], after which the Court took the motions under advisement.

## II.    SUMMARY OF THE EVIDENCE

At the July 27, 2023 evidentiary hearing, the Government presented seven exhibits (some with multiple subparts) and the testimony of LCPD Sergeant Lynette Ladd. The Court summarizes the evidence as follows:

Sergeant Ladd testified she is an investigator with the LCPD, where she has worked for twenty-six years. She served as the lead investigator of a lottery scheme resulting in the charges

4

to Defendants Forrester and Brown. According to Sergeant Ladd, on September 24, 2023, Sandra Cruze, then age seventy-six and a resident of Lenoir City, filed a police report. Sergeant Ladd said Ms. Cruze reported receiving information that she had won the Golden Casket lottery. Ms. Cruze stated she had been mailing cash payments and wiring money to others at the direction of two men who identified themselves as "Richard" and "Lucky Graham." Ms. Cruze reported that she had paid approximately $672,000 from her checking account and by liquidating insurance policies and bonds. Sergeant Ladd stated that Ms. Cruze told her she made these payments in response to letters requiring fees and taxes necessary to release the lottery funds. Ms. Cruze reported that she met a courier at the Walmart in Lenoir City who collected $80,000 in cash from her. In response to information from Ms. Cruze that Richard and Lucky Graham were still trying to collect cash from her, Sergeant Ladd provided Ms. Cruze with a recording device to record calls from them.

Sergeant Ladd testified that Ms. Cruze recorded two telephone conversations. The Government submitted these audio recordings as Exhibits 1.1 and 1.2 and played them. On October 20, 2021, Ms. Cruze called Richard at 3:47 p.m. [Exh. 1.1]. They discussed that Ms. Cruze owed $150,000, that she was getting the money from a friend, and that Richard would arrange to pick it up the following day [*Id*.]. Richard told Ms. Cruze to separate the $150,000 into two packages of $75,000 each [*Id*.]. When Richard suggested that the meeting could be delayed until the following Saturday, Ms. Cruze protested that she did not want to keep the money in her house over several days [*Id*.]. Richard pointed out that she had previously had the $80,000 at her home [*Id*.]. Ms. Cruze ended the call when someone came to her door [*Id*.]. Sergeant Ladd testified that the reference to $80,000 was to money that Ms. Cruze had previously provided to a courier.

The Government next played Exhibit 1.2, a recording of a call from Ms. Cruze to Richard on that same day, October 20, 2021, at 4:11 p.m.  Ms. Cruze told Richard that her friend called and has the money [Exh. 1.2].  She told Richard that she would pick up the money later that night and arrange it as directed [*Id.*].  Richard said he would call her tomorrow with the meeting time [*Id.*].  Sergeant Ladd testified that Richard later called Ms. Cruze and changed the date for the couriers to pick up the money from October 21 to October 22.

Sergeant Ladd said she created an operation plan for law enforcement for the planned meeting on October 22.  She confirmed that the operation plan states that the victim will be meeting an unknown person or persons and was instructed to divide the cash into two packages [Doc. 93-1 p. 3].[2]  Sergeant Ladd agreed that the plan states that two vehicles could be involved [*Id.*].  The operation plan also provides the details from the prior pick up in August 2021 [*Id.*].  Sergeant Ladd stated that the first courier used the name James Brown and that Ms. Cruze described him as a black male around twenty-five years old, with hair that was high on top.  According to Sergeant Ladd, Ms. Cruze said the previous courier was tall, of average build, well-dressed, and well-groomed.  Sergeant Ladd said she included this description in the operation plan, as well as noting that the prior courier was in a rental vehicle.  She explained that Richard told Ms. Cruze that the prior courier (the one who picked up $80,000 from Ms. Cruze in August) would fly into Knoxville and rent a car.  Sergeant Ladd said, based on this information, law enforcement anticipated that the courier could arrive in a rental vehicle.

Sergeant Ladd testified about a map of the shopping center containing the Lenoir City Walmart [Exh. 2.1].  The map shows that a China King Buffet and Dollar Tree store are beside Walmart and share a common parking lot [*Id.*].  On the other side of Walmart is a Home Depot,

---

[2]     The operation plan for October 22, 2021, is attached as an exhibit to the Government's response [Doc. 93-1].

the parking lot of which abuts the Walmart parking lot [*Id.*]. Sergeant Ladd also pointed out Smoky Mountain Trailers, which is down the road from Walmart and on the opposite side of the street [*Id.*].

Sergeant Ladd stated that around 7:00 a.m., on October 22, 2021, she met with surveillance teams who would be reporting to Walmart. She said the LCPD had three unmarked vehicles in the area. Additionally, the drug task force director was present in another vehicle, Homeland Security agents participated, and a Tennessee Highway Patrol ("THP") helicopter was standing by to assist. According to Sergeant Ladd, law enforcement knew that Richard had told Ms. Cruze that two people would be arriving to pick up the money and that is why she was instructed to divide it into two bags. Sergeant Ladd said they also suspected the prior courier, a black male, could return and that the prior courier was supposedly in a rental vehicle. She said the surveillance teams were looking for these things.

Sergeant Ladd testified about a radio conversation from 7:38 a.m., on October 22, reporting two black males in a gray Toyota RAV4 with Florida tags [Exh. 3.3]. Sergeant Ladd identified the speaker as Officer James Kettner, who was in the Walmart parking lot near the grocery entrance, which is where Ms. Cruze previously met the August courier. Sergeant Ladd said surveillance officers first saw the RAV4 turning beside the ORNL credit union and traveling toward Highway 321.

Sergeant Ladd stated that the RAV4 returned to the parking lot and backed into a parking space near the Murphy Oil gas station, then moved and parked near the China King Buffet. In a radio transmission from 7:41 a.m., an officer provided a license tag number to the dispatcher [Exh. 3.4]. Sergeant Ladd identified this officer as Deputy Director DeBoer and said he was calling in the tag number for the RAV4 to the dispatch center. In a subsequent transmission, the

dispatcher states the vehicle belongs to Ian Holdings, which Deputy Director DeBoer says is Enterprise Rental [Exh. 3.5]. After testifying to a dispatch regarding a white male on foot [Exh. 3.6], Sergeant Ladd agreed that the surveilling officers were watching several vehicles and people. In a transmission from 7:59 a.m., Deputy Director DeBoer states that the RAV4 was rented in Fort Lauderdale, Florida, by a black female the day before [Exh. 3.8]. Sergeant Ladd explained that Deputy Director DeBoer called Enterprise to verify who rented the vehicle. Deputy Director DeBoer also reported that Ms. Cruze was on the way to their location [*Id.*].

Sergeant Ladd stated that Ms. Cruze arrived and parked in the agreed location, which was in the lower parking lot near a Zaxby's restaurant. She said after Ms. Cruze arrived, Richard called her and asked to change the location for the meeting to the Walmart on Parkside Drive. A radio transmission from 8:54 a.m. relayed that "they" (the perpetrators) wanted Ms. Cruze to move to the Walmart on Parkside Drive, but Ms. Cruze was trying to resist moving [Exh. 3.9]. Sergeant Ladd identified Deputy Director DeBoer as the speaker and stated that he was monitoring Ms. Cruze's conversation through a listening device in her car. Sergeant Ladd stated that Ms. Cruze told Richard that she did not want to change locations because she did not have a navigation system in her car.

After listening to a radio transmission from 8:56 a.m. [Exh. 3.10], Sergeant Ladd testified when Deputy Director DeBoer said he thought the RAV4 was "probably it," he meant it was likely the vehicle involved in the meeting with Ms. Cruze. Sergeant Ladd said at this point, officers had seen the RAV4 circling the area earlier that morning, saw the RAV4 park in different locations in the parking lot, and observed it leave the area when Richard tried to change the meeting location. At 8:58 a.m., Deputy Director DeBoer radioed that the couriers "are back en route to us" and that Ms. Cruze was on a call with them trying to get a description of their

8

vehicle [Exh. 3.11]. Sergeant Ladd explained that Richard told Ms. Cruze that the courier would meet her at the Lenoir City location and that they were heading that way. She said Ms. Cruze tried to get Richard to describe the courier's vehicle. At 9:10 a.m., Deputy Director DeBoer radioed that Richard would not describe the courier's vehicle [Exh. 3.12].

Sergeant Ladd testified that at 9:14 a.m., the surveillance teams were watching for a car or a person to approach Ms. Cruze's vehicle. At that point, an agent on the scene radioed that he saw the RAV4 return, that the passenger was on the phone, and that the passenger was "definitely checking" the parking lot [Exh. 3.13]. Another officer radioed that the RAV4 with the same Florida license tag had returned [Exh. 3.14]. At 9:20 a.m., officers observed the RAV4 driving through the parking lot toward the Walmart grocery entrance [Exh. 3:15]. Sergeant Ladd testified that the grocery entrance is near the China King Buffet. She stated the officers lost sight of the RAV4 and thought it had gone behind Walmart.

Sergeant Ladd said she was in a parked car with Captain Flynn and Lieutenant Dishner in the Home Depot parking lot and had Ms. Cruze's vehicle in sight. She stated that the RAV4 circled around her vehicle and through the Home Depot parking lot three times before parking in the lower parking lot near the Penske rental trucks.

Sergeant Ladd testified that a black male wearing a white shirt walked to Ms. Cruze's car and got in her vehicle. She stated that the black male did not come from the RAV4. In a radio transmission from 9:43 a.m., an officer described a black male with a white button-down shirt, black pants, and wearing a blue medical mask was walking through the parking lot [Exh. 3.16]. Sergeant Ladd testified that the officers thought the RAV4 might have dropped off the black male when it drove near the China King Buffet before it parked at Home Depot. Another radio transmission from 9:43 a.m., discussed that the officers did not see the black male arrive but saw

him walking from the direction of the Dollar Tree [Exh. 3.17]. Sergeant Ladd testified that the officers suspected that the RAV4 had dropped the black male off near the Dollar Tree.[3] The officer then stated that the black male got into Ms. Cruze's vehicle [*Id*.]. Sergeant Ladd confirmed that the reference to a car by the KFC was to the RAV4, which was parked near the Kentucky Fried Chicken[4] [Exh. 3.18]. She explained that while the black male was inside Ms. Cruze's vehicle, some officers were moving toward the RAV4 [*See id*.].

Sergeant Ladd testified that as described in the radio transmission from 9:46 a.m., officers observed the black male get out of Ms. Cruze's vehicle and run toward the "market side" of the parking lot [Exh. 3.19]. She said the black male, who was later identified as McFarlane, got out of Ms. Cruze's vehicle carrying the two gift bags Ms. Cruze had prepared, and when officers approached him, the black male fled on foot. Sergeant Ladd stated that the radio transmission from 9:46 a.m. shows the RAV4 left around the same time that McFarlane was fleeing [*See* Exh. 3.20].

Sergeant Ladd stated that McFarlane ran to another vehicle, which the surveillance teams did not realize was involved and which was parked near the China King Buffet and the Dollar Tree. She said law enforcement pursued that vehicle, a Nissan, on Highway 321 [*See* Exh. 3.21].[5]

Sergeant Ladd testified about video footage from a Home Depot security camera [Exh. 6.1–6.8]. She stated that when the video begins, the RAV4 is not visible because it is parked on

---

[3] The map of the shopping center shows the China King Buffet is beside the Dollar Tree, which is beside Walmart [Exh. 2.1].

[4] Another map of the shopping center shows the KFC is on the corner of Abbie Drive and Kelley Lane by the back corner of the Home Depot parking lot [Exh. 2.2].

[5] Officers stopped the Nissan shortly thereafter and took the two occupants into custody [*See* Exh. 3.22].

the other side of a yellow Penske box truck. Sergeant Ladd stated that Ms. Cruze's vehicle is on the other side of Abbie Road from the RAV4. Testifying to a photographic exhibit she prepared [Exh. 5], Sergeant Ladd stated that a hedge with periodic breaks runs along Abbie Road and separated the RAV4 and Ms. Cruze's vehicle. She said Ms. Cruze's vehicle was visible to the occupants of the RAV4 through a break in the hedge. With regard to the video from the Home Depot security camera, Sergeant Ladd stated that during the first minute, a black truck drives in front of the Home Depot and turns right [Exh. 6.1]. She said Deputy Director DeBoer was in the black truck conducting a check of the Home Depot parking lot. Sergeant Ladd identified Ms. Cruze's white car parked near a red truck in the top left of the video [*Id.*].

Approximately, one minute and twelve seconds into the security video, the RAV4 emerges from behind the yellow box truck and proceeds toward the front of the Home Depot [*Id.*]. At that time, a customer in a white pickup truck is driving parallel to the front of the Home Depot toward the RAV4 [*Id.*]. At one minute and nineteen seconds into the video, a white Altima sedan containing a surveillance team drives toward the white pickup truck from the opposite direction and also parallel to the store [*Id.*]. At one minute twenty-two seconds into the video, the white truck pauses in front of the lane containing the RAV4, blocking the RAV4 from turning in front of the store [*Id.*] At this point, the Altima is traveling toward the pickup truck in the same lane of travel [*Id.*]. At one minute and twenty-three seconds into the video, the Altima turns left into the lane containing the RAV4, and the RAV4, which had been stopped several feet from the side of the pickup truck begins driving toward the truck [*Id.*]. Two seconds later (1:24), the RAV4 hits the passenger side of the pickup truck and bounces backward, and one to two seconds after that (1:26), the Altima strikes the passenger side of the RAV4, pushing it sideways [*Id.*].

Testifying about the video, Sergeant Ladd stated that as the unmarked sedan containing the surveillance team began to turn into the parking lane, the driver of the RAV4, whom she identified as Defendant Forrester, accelerated into the pickup truck.  Sergeant Ladd pointed out that, just before the one-minute mark (0:58) on the video, a person in a white shirt emerges from Ms. Cruze's vehicle and begins fleeing on foot [*Id.*].  Sergeant Ladd said when the person in the white shirt began running, the RAV4 quickly drove down the parking lane.  She agreed that the RAV4 pulled out almost simultaneously with McFarlane running.  Sergeant Ladd reiterated that as the Altima turned into the lane containing the RAV4, Defendant Forrester accelerated into the pickup truck.  Sergeant Ladd identified a series of still shots from the video [Exhs. 6.2–6.8] and a photograph of the collision [Exh. 7].

Sergeant Ladd stated that during the operation, Ms. Cruze's daughter-in-law, Christie Lightfoot, parked in the Home Depot parking lot because she was concerned about Ms. Cruze's safety.  According to Sergeant Ladd, while there, Ms. Lightfoot called the LCPD to report that a RAV4 with Florida tags had parked beside her.  Ms. Light foot reported that the RAV4 contained two black males, "crunched down" in their seats, as if attempting to hide, with one holding up a phone.  Sergeant Ladd said this occurred before McFarlane picked up the giftbags.  She stated that Ms. Lightfoot reported this suspicious behavior to the LCPD's administrative assistant, who relayed the information to the surveilling officers.

After listening to the final radio transmission from 9:48 a.m. [Exh. 3.21], Sergeant Ladd explained that Deputy Director DeBoer pursued the Nissan in which McFarlane fled and stopped the Nissan at Smoky Mountain Trailers.  She said in the transmission, Deputy Director DeBoer is confirming that someone followed the RAV4.  Sergeant Ladd said the officers believed the RAV4 was also present for the meeting with Ms. Cruze because they thought there could be two

vehicles involved and because of the suspicious behavior by the occupants of the RAV4, namely leaving when Richard tried to switch the location of the meeting and returning when Ms. Cruze refused to change locations. Sergeant Ladd said Deputy Director DeBoer did not realize that the RAV4 had collided with the truck at that point because he was at a different location.

Sergeant Ladd agreed that at some point, law enforcement obtained the rental agreement for the RAV4, and Tessa Hines was listed on the rental agreement as the only driver.

On cross-examination by Ms. Hughes, Sergeant Ladd testified that she first met with Ms. Cruze on September 21, when ORNL Credit Union contacted Sergeant Ladd about suspicious activity on Ms. Cruze's account due to Ms. Cruze wiring a lot of money. Sergeant Ladd said Ms. Cruze came to the LCPD on September 24 and filled out a police report. She said Ms. Cruze reported mailing payments to different locations, some of which were addresses in Florida. Sergeant Ladd agreed that Ms. Cruze identified one payment as going to Jahmarley McFarlane in Florida. She also affirmed that none of the payments were addressed to Tessa Hines or Morice Brown.

Sergeant Ladd agreed that Ms. Cruze reported meeting with a courier in Lenoir City in August and giving him about $80,000. She said Ms. Cruze described the courier but could not describe the vehicle in which he arrived or if he had anyone with him because it was raining hard at the time of the meeting. She said Ms. Cruze reported that Richard told her the courier was James Brown, would fly into Knoxville, and would rent a car. Sergeant Ladd said the courier signed a receipt as James Brown.

Sergeant Ladd affirmed that she did not have a vehicle description for the courier to include in the operation plan. She agreed the caller told Ms. Cruze he was sending two couriers and directed her to put the money into two packages. She acknowledged that while she believed

the couriers would be in two vehicles because of the two packages, Richard did not advise there would be two vehicles or discuss the type of vehicle.

Sergeant Ladd said she met with other officers to go over the operation plan at 7:00 a.m. on the day of the meeting. She thought fifteen officers were involved, using four or more vehicles and a helicopter. The vehicles were stationed around the parking lot, and some were mobile while others were stationary. Sergeant Ladd said the surveilling officers noticed several vehicles of interest, including the RAV4. She said the RAV4 first appeared in the Walmart parking lot then left traveling toward Highway 321 as if leaving the parking lot. She stated that the RAV4 returned a few minutes later, and the surveilling officers checked the license tag and learned the car was owned by Ian Holdings and rented by Hines.

Sergeant Ladd said Ms. Cruze was alone in her car and had a listening device. She stated the device allowed the officers to hear Ms. Cruze, but they could not talk to her. She agreed that a black male in his twenties came to Ms. Cruze's vehicle and entered it. Sergeant Ladd said Ms. Cruze's conversation with the courier was not recorded. She agreed it was later determined that the courier from both August and October was McFarlane. Sergeant Ladd said McFarlane came from the direction of the Dollar Tree. She agreed that McFarlane was never seen in the RAV4. Sergeant Ladd said that around the time the officers lost sight of the RAV4, it drove to the area of the Dollar Tree before parking at the Home Depot. She said McFarlane was in Ms. Cruze's vehicle for around one minute. She later learned that McFarlane took both gift bags, but she could not see that from where she was parked at Home Depot monitoring the parking lot for suspicious vehicles.

Sergeant Ladd said when McFarlane got out of Ms. Cruze's vehicle, two officers chased him, and he ran on foot toward the Dollar Tree and the China King Buffet. She said her

14

surveillance team drove in that direction and an officer saw McFarlane get into a Nissan Altima. The Nissan contained another black male, whom she now knows is Ramsay. She said she did not know the identities of McFarlane or Ramsay until she returned to the police department. Sergeant Ladd stated that did not know until after the operation that McFarlane was the same person who came in August, although one of the officers monitoring the conversation in Ms. Cruze's car said it was going to be the same person as in August. She said she was present for the arrest of McFarlane and Ramsay, which occurred at the same time as the stop of the RAV4 and the officers taking Defendants Brown and Forrester into custody. She agreed that on the radio transmission, officers indicated there were "two in custody" for both McFarlane and Ramsay and again for Forrester and Brown. She agreed that Defendants Forrester and Brown were taken into custody right after they "rammed" another vehicle. She did not know where the cellphones seized in relation to Defendants Forrester and Brown were located. By the time she arrived at the scene, Defendants Forrester and Brown were in custody.

Sergeant Ladd said that she testified before the Grand Jury in this case. She agreed that in her testimony before the Grand Jury, the prosecutor asked when she knew that Hines, Brown, and Forrester were involved, and she responded that it was after the transfer of the $150,000 in the parking lot.

On cross-examination by Mr. Rodgers, Sergeant Ladd testified that the surveilling officers set up in the parking lot a little after 7:00 a.m., and thereafter, they reported seeing the RAV4. She agreed a RAV4 is not suspicious by itself but stated that here, the RAV4's movements were suspicious. Sergeant Ladd stated that the officers were looking for a rental vehicle and knew the previous courier had been a black male. She agreed that Lenoir City is close to an interstate exit, that the use of rental vehicles is not uncommon, and that travelers stop

in Lenoir City. Sergeant Ladd acknowledged that black males in a rental vehicle is neither uncommon, nor suspicious. She said none of the officers saw more than two black males in the RAV4.

Sergeant Ladd stated that officers knew many of the payments by Ms. Cruze were mailed to Florida. She said when they saw the RAV4 and checked the Florida plates, they learned it was a rental vehicle. Sergeant Ladd said the RAV4 was the only vehicle that she was advised was leaving the parking lot and returning. She stated that typically there is not much activity at Walmart in the early morning. According to Sergeant Ladd, although the RAV4 was not the only vehicle moving around in the parking lot, it was suspicious because it met the description of what the officers were looking to find.

Sergeant Ladd denied that she was told that one of the occupants of the RAV4 went into the Dollar Tree, then returned to the parking lot. She acknowledged that the officers said the RAV4 parked near the Dollar Tree, but she had no knowledge of the occupants of the RAV4 going inside the Dollar Tree. Sergeant Ladd said she did not think the Dollar Tree was open at that time of day. She agreed that parking by the Dollar Tree is not suspicious but explained here the RAV4 had some of the characteristics for which they were looking: It was a rental vehicle from Florida driven by a black male.

Sergeant Ladd agreed that the officers were not certain that two vehicles would be involved in the meeting with Ms. Cruze, but they knew Richard had Ms. Cruze divide the money into two packages. She thought Richard said two people would be picking up the money. Sergeant Ladd said Ms. Cruze did not know if two people were involved in the August meeting when Ms. Cruze provided $80,000.

16

Sergeant Ladd agreed that about one and one-half hours elapsed between first seeing the RAV4 and it parking beside the truck seen on the security video. She agreed that by that time, the shopping center was busier, and more vehicles were moving in the parking lot. She agreed that she did not personally observe the RAV4 break any traffic laws. Sergeant Ladd said the RAV4 committed a traffic violation when it "sped away and rammed into the truck." She agreed that she did not know if either Defendant Forrester or Brown was the caller "Richard."

Sergeant Ladd stated that she was in an unmarked vehicle parked at the Home Depot and the RAV4 drove by her vehicle three times before it parked where it was located in the video. She agreed that she has pulled into a parking lot when working patrol, to send a text, and to check her cellphone or email. She agreed that pulling into a parking lot in those circumstances was not uncommon or suspicious. Sergeant Ladd stated that law enforcement's information about the RAV4 went beyond the fact it contained two black males. She said, instead, the officers knew the RAV4 was a rental vehicle, that the prior courier was a black male, and that Ms. Cruze mailed many packages to Florida. She also said that it is not unusual for someone planning to commit a crime to check out the area first. Sergeant Ladd pointed out that the RAV4 left the area when Richard wanted to change the location of the meeting and returned when Ms. Cruze refused to do so. Finally, she noted that the RAV4 went to the part of the parking lot where Ms. Cruze was located.

Sergeant Ladd could not state how many vehicles entered the parking lot during the surveillance or if they were rental vehicles containing black men. She thought, however, that the surveillance teams would have reported if they saw a vehicle leave and return, as they did with the RAV4. She stated that the surveillance teams notified her of other suspicious vehicles during the operation.

17

Sergeant Ladd agreed that the RAV4 was parked across a street from the Walmart parking lot. She acknowledged that the street separating the two parking lots was three lanes wide. She agreed that the RAV4 was parked approximately 100 yards from Ms. Cruze. Sergeant Ladd stated that Ms. Cruze's vehicle was visible through a break in the hedge from where the RAV4 was parked because Ms. Cruze's daughter-in-law, who came to watch over Ms. Cruze, was parked beside the RAV4's location. Sergeant Ladd denied that Ms. Cruze's daughter-in-law was working for the LCPD. She said that when Ms. Cruze's daughter-in-law observed the occupants of the RAV4 behaving suspiciously, she moved her car to another location and called the police department. Sergeant Ladd did not know how long the daughter-in-law was in the parking lot. She acknowledged that the surveillance teams did not report the daughter-in-law's vehicle. She agreed that many people had a view through the hedge to where Ms. Cruze was parked and that it is not unusual to use a cellphone in a parking lot.

Sergeant Ladd agreed that the surveillance vehicle that stopped the RAV4 was not marked as a police car and did not have lights or a siren. She agreed the surveillance vehicle was driving toward a pickup truck in the truck's lane. She acknowledged that the pickup truck possibly stopped because the surveillance vehicle was driving toward it in its lane. Sergeant Ladd said the pickup truck stopped, and as the surveillance car started to turn in front of the truck into the lane, the RAV4 accelerated and hit the truck. She said the RAV4 hit the truck before the surveillance car made contact with the RAV4. Sergeant Ladd said the reason that the officers in the surveillance car made contact with the RAV4 is because it hit the truck. She opined that the surveillance car could have made the turn into the lane of the parking lot.

Sergeant Ladd stated that after the collision, Defendants Forrester and Brown were taken into custody. She said they were taken to the police department, where law enforcement

continued the investigation. Sergeant Ladd said Defendant Forrester was charged with aggravated assault, and both Forrester and Brown were charged with financial exploitation of an elder. She acknowledged that at the time the Defendants were taken into custody, they were not immediately charged with financial exploitation of an elder because law enforcement was still investigating that offense. She said that, instead, they were charged with aggravated assault of the driver of the truck and evading arrest. She said that once at the police station, Defendant Forrester allowed Deputy Director DeBoer to look at his cellphone during an interview. Sergeant Ladd said she was not involved in Defendant Forrester's interview, but she reviewed it.

Sergeant Ladd stated that the RAV4 was first seen in the parking lot around 7:30 a.m., it parked, and then left. She agreed that the RAV4 then returned to the parking lot and that the surveilling officers did not know the identities of the occupants of the RAV4. She acknowledged that law enforcement did not know with whom the occupants of the RAV4 were communicating on their cellphones.

On redirect examination, Sergeant Ladd denied that the officers stopped the RAV4 because of a "hunch." She agreed that a vehicle driving through a parking lot slowly, early in the day, noting the people parked in the lot, could be a basis for suspicion. Sergeant Ladd also agreed that parking in a position to observe the individual entering a car, then running away from police is suspicious. She said neither the race of the occupants of the RAV4, nor the fact that they were driving a rental car, was the basis for the officers' suspicions. Sergeant Ladd agreed, however, that renting a vehicle in Florida and driving twelve hours to Lenoir City the day before the arranged meeting were factors that contributed to the officers' suspicion when viewed with the actions of the RAV4 that morning.

Sergeant Ladd testified that even if blocked in by the pickup truck and the surveillance car, the RAV4 did not have to drive into the pickup truck. She said, instead, the RAV4 could have stopped.

On recross-examination by Ms. Hughes, Sergeant Ladd said that driving slowly through a Walmart parking lot would not necessarily be suspicious. She said driving fast through a Walmart parking lot, however, would get law enforcement's attention. Sergeant Ladd agreed that when an officer checked the license tag for the RAV4, it was rented by Tessa Hines. She said that Tessa Hines had not previously come up in her investigation of the lottery scheme.

On further redirect examination, Sergeant Ladd stated that she later learned that Tessa Hines had given Defendants Forrester and Brown permission to use the RAV4 that morning.

## III. FINDINGS OF FACT

Based upon the testimony and exhibits presented at the evidentiary hearing, the undersigned finds as follows:

In late September 2021, a credit union alerted the LCPD that an account holder, Sandra Cruze, had been wiring large amounts of money. Sergeant Ladd of the LCPD contacted Ms. Cruze to investigate. Ms. Cruze, age seventy-six, told Investigator Ladd that she was told she had won a lottery but must pay various fees and taxes to collect her winnings. Ms. Cruze reported that two individuals, Richard and Lucky Graham, contacted her to mail payments to various locations, including to several addresses in Florida. In August 2021, Richard sent a courier to Lenoir City to collect a cash payment. According to Ms. Cruze, Richard told her that the courier would fly to Knoxville, Tennessee; rent a car; and drive to Lenoir City to pick up the money. Ms. Cruze met the courier, a young, black male, who was well-groomed and had tall

hair, in the parking lot of the Walmart in Lenoir City and gave him a package containing $80,000. Ms. Cruze reported paying more than $672,000 total to the scheme.

When Sergeant Ladd learned that Richard and Lucky Graham were still calling Ms. Cruze asking for more money, Sergeant Ladd gave Ms. Cruze a recording device. Ms. Cruze recorded two conversations with Richard, in which she arranged to meet couriers in the Lenoir City Walmart parking lot to make a $150,000 payment. Richard instructed Ms. Cruze that he would send two couriers and for her to place the money in two packages, each containing $75,000. Richard changed the date of the meeting from October 21, 2021, to October 22, 2021. Ms. Cruze relayed this information to the LCPD and gave them the recordings.

Sergeant Ladd created an operation plan to have teams of surveillance officers stationed in and around the Walmart parking lot on October 22, 2021. She informed the officers involved in the operation that the prior meeting was with a black male, who was around age twenty-five, well-dressed, and had tall hair. Sergeant Ladd also told them that the previous courier likely drove a rental car. Finally, she instructed the surveillance teams that Ms. Cruze was told to divide the money into two packages, that the meeting would involve two couriers, and that the couriers could possibly be in two vehicles. On the morning of October 22, teams of officers in at least four unmarked vehicles were stationed around the shopping center containing the Lenoir City Walmart. Ms. Cruze's vehicle was equipped with a listening device that allowed officers to hear conversations inside her car but not to talk with her. Shortly after 7:00 a.m., the surveillance teams began watching for vehicles that could belong to the couriers.

Around 7:30 a.m., surveilling officers noticed a gray Toyota RAV4 with a Florida license plate enter the Walmart parking lot and then exit as if leaving the shopping center. At 7:38 a.m., officers saw the RAV4 return, drive through the shopping center parking area, and park near a

gas station. Shortly thereafter, the RAV4 moved to park by the China King Buffet, which is beside the Dollar Tree and the grocery-side entrance to Walmart. An officer requested a check of the RAV4's Florida license tag and learned that the RAV4 belonged to Ian Holdings, which owned Enterprise rental company. The officer then called Enterprise and learned that the RAV4 was rented to a black female Tessa Hines in Ft. Lauderdale, Florida, the day before. This information was radioed to the surveillance teams. At 7:59 a.m., the surveillance teams were alerted that Ms. Cruze was on her way to the shopping center.

Ms. Cruze arrived at the shopping center and parked in the lower parking lot of Walmart. Around 8:54 a.m., Ms. Cruze received a call from Richard, seeking to move the meeting to the Walmart on Parkside Drive. Surveilling officers noticed that the RAV4 again left the shopping center. Shortly thereafter, Ms. Cruze refused to relocate, stating that she did not have a navigation system. Richard agreed the meeting would be at the Lenoir City Walmart. At 8:58 a.m., an officer monitoring Ms. Cruze's conversations radioed that the couriers were on their way back to the Walmart parking lot. At 9:14 a.m., a surveilling officer radioed that the RAV4 had returned to the shopping center, the passenger was on the phone, and the passenger was "checking" the parking lot.

Officers observed the RAV4 drive through the adjacent Home Depot parking lot three times, before parking in the lower lot in a location from which Ms. Cruze's vehicle could be seen through a break in a hedge. Christie Lightfoot, Ms. Cruze's daughter-in-law, who was present of her own accord to watch over her mother-in-law, saw a RAV4 with Florida plates park near her in the lower Home Depot parking lot at a spot from which Ms. Cruze's car was visible. Ms. Lightfoot observed two black men in the RAV4 "crunched down" to be less visible and saw one of the occupants holding up a cellphone. Ms. Lightfoot moved to a different part of the parking

lot and reported her observations to the LCPD. The information from Ms. Lightfoot was relayed to officers on the scene.

At approximately 9:43 a.m., a black man wearing a white shirt and black pants, walked from the area of the Dollar Tree to Ms.Cruze's car and got in the passenger's seat. Approximately one minute later, he got out of her vehicle carrying both packages. Officers chased him on foot through the parking lot. The man, later identified as Jahmarley McFarlane, got into a Nissan, driven by a black man later identified as Jamali Ramsay, and sped away. Officers gave chase, stopped the Nissan a short distance away from the shopping center, and arrested the occupants, McFarlane and Ramsay.

About twenty seconds after McFarlane fled through the parking lot, chased by police, the RAV4 quickly left the lower lot and drove up a lane of the parking lot toward the Home Depot. A pickup truck stopped perpendicular to that lane, blocking the RAV4. A surveillance team in an unmarked Nissan Altima drove up to the truck and began to turn left into the lane. At that point, the RAV4, which was stopped several feet from the truck, drove into the side of the truck with such force that it bounced backward. The surveillance vehicle continued into the lane and contacted the rear passenger side of the RAV4. Officers removed the RAV4's occupants, who were identified as Marklyn Forrester (the driver) and Morice Brown (the passenger), from the RAV4 and arrested them. Three cellular telephones were seized from the RAV4. The Defendants were transported to the LCPD, where Defendant Forrester was interviewed. Both Forrester and Brown were later charged with financial exploitation of an elder. Their cellphones were subsequently searched pursuant to a search warrant.

## IV.    ANALYSIS

The Fourth Amendment secures the right to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  Defendants Forrester and Brown argue that law enforcement violated their Fourth Amendment rights by (1) stopping their vehicle without reasonable suspicion of any crime and (2) arresting them without probable cause.  As a result of these violations, the Defendants ask the Court to suppress all evidence flowing from the illegal stop and arrest, including data seized from the search of their cellular phones.  The Court examines each of these issues in turn.

### A.  Standing

As an initial matter, the Court finds Defendants Forrester and Brown have standing to challenge the stop of the RAV4.  "[S]tanding is 'an element' of a Fourth Amendment suppression claim" and a "defendant bears the 'burden' of showing he [or she] has standing," which is a legitimate expectation of privacy or a property interest in the article searched or seized.  *United States v. Russell*, 26 F.4th 371, 375, 377 (6th Cir. 2022).  All occupants of a vehicle have standing to challenge the constitutionality of the stop of the vehicle, which is also a detention of their persons.  *See Brendlin v. California*, 551 U.S. 249, 257, 263 (2007) (holding that a passenger is seized when an officer makes a traffic stop and may therefore challenge the constitutionality of the stop).

Defendants also challenge the seizure of evidence, such as cellphones, from the RAV4. Here, Defendants Forrester and Brown were neither the renters of the RAV4 nor registered drivers.  Sergeant Ladd testified that the RAV4 was a rental vehicle, rented by Tessa Hines, who was listed as the sole driver.  However, Sergeant Ladd stated that she later learned Defendants were using the RAV4 with Hines' permission.

24

Defendant Forrester, as the driver in lawful possession of the RAV4, has standing to challenge the seizure of evidence therefrom. A driver, who is "in otherwise lawful possession and control of a rental car has a reasonable expectation of privacy in it even if the rental agreement does not list him or her as an authorized driver." *Byrd v. United States*, 584 U.S. __, 138 S. Ct. 1518, 1524 (2018); *see United States v. Smith*, No. 3:19-CR-22-KAC-DCP, 2022 WL 14742777, at *7 (E.D. Tenn. Sept. 16, 2022) ("[T]he driver must demonstrate that he owned the vehicle or 'obtained possession from the owner of the vehicle or someone authorized by the owner to give him possession of the vehicle.'" (quoting *United States v. Taylor*, 496 F. Supp. 2d 852, 856 (S.D. Ohio 2006)). Here, Forrester had permission from Hines to drive the rental car.

Finally, both Forrester and Brown can challenge evidence that flows from their unlawful detention. *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007). In *Ellis*, the Court found that while the passenger could not challenge the owner's consent to search the vehicle, the passenger had "standing to challenge his alleged unlawful seizure and the evidence that flowed from the search and seizure[,]" which would include the cocaine seized from the vehicle. *Id.* at 612, 614 (declining to suppress the cocaine seized from the vehicle because the "lawful traffic stop did not evolve into an unconstitutional seizure" and, thus, the cocaine "did not flow from a Fourth Amendment violation"); *see also United States v. Torres-Ramos*, 536 F.3d 542, 549 (6th Cir. 2008) (holding passengers lacked standing to object to search of van but could still challenge their stop and detention and seek suppression of the fruit of their illegal seizure).

Thus, the Court finds, and the Government agrees [Doc. 108 p. 5], that Defendants Forrester and Brown have standing to challenge the stop of the RAV4 and the seizure of any evidence from that stop.

### B. Constitutionality of Vehicle Stop

An officer may lawfully stop a car when he or she has either probable cause to believe that a traffic violation has occurred or reasonable suspicion of an ongoing crime. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Defendants argue that the LCPD lacked reasonable suspicion to conduct an investigatory stop of the RAV4 [Doc. 87 pp. 1–2; Doc. 89 pp. 3–4; Doc. 107 p. 3–6; 108 pp. 5–6]. They contend that because law enforcement apprehended McFarlane and Ramsay, who were clearly the couriers sent by Richard, they had no reason to pursue the RAV4, which behaved in a wholly innocent manner in the shopping center parking lot [Doc. 107 pp. 5–6]; Doc. 108 pp. 3, 5]. Thus, they assert that the stop of the RAV4 violated the Fourth Amendment.

The Court finds at the time the surveilling officers stopped the RAV4, they had reasonable suspicion of an ongoing crime. Law enforcement may temporarily seize a person or vehicle and, thus, conduct an investigatory or *Terry* stop, if the officer has "reasonable suspicion" of ongoing criminal activity stemming from "specific and articulable" facts known to the officer at the time of the seizure. *Terry v. Ohio*, 392 U.S. 1, 21–22, 27 (1968); *Blair*, 524 F.3d at 750 ("Under *Terry*, police may stop a vehicle based on reasonable suspicion of an ongoing crime."); *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994) ("It is well settled that the *Terry* doctrine applies to investigative stops of a moving automobile"); *see also United States v. Gomez*, No. 22-20395, 2023 WL 3562984, at * 6–7 (E.D. Mich. May 19, 2023) (holding officer had reasonable suspicion to stop vehicle based upon collective knowledge doctrine and information linking defendant to drug trafficking, including that defendant was in route to deliver drugs to confidential informant).

Reasonable suspicion is an amount of proof that is "considerably less" than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)); *see also Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'"). The Court evaluates the presence of reasonable suspicion based upon the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. The "collective knowledge doctrine" permits an officer to stop an individual based upon information from another officer "who possesses the facts necessary to establish reasonable suspicion." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012). Reasonable suspicion "is not a high bar—all that is needed is 'a minimal level of objective justification'" for the stop." *United States v. Bowman*, No. 1:21-cr-56-TRM-SKL, 2022 WL 1518251, at *4 (E.D. Tenn. Feb. 11, 2022) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Sokolow*, 490 U.S. at 7)), *report & recommendation adopted by United States v. Fort*, 2022 WL 1117101 (E.D. Tenn. Apr. 14, 2022).

Here, the surveilling officers in the white Altima were directed to stop the RAV4 by other officers on the scene. At this point, the officers collectively knew that the RAV4 was a rental vehicle driven by two young black males, two factors which matched the prior courier from August. Moreover, the RAV4 had been rented the day before in Florida, the location to which Ms. Cruze mailed several payments. The surveilling officers had observed the RAV4 come and go from the shopping center at least twice, circling the parking lots around the meeting spot as if checking the area for police presence, and ultimately, parking in a spot that allowed them to view

27

Ms. Cruze's car. Notably, officers observed the RAV4 leave the parking lot near the time that Ms. Cruze received a call from Richard to change the location of the meeting and return to the parking lot after Richard agreed the meeting could occur at the Lenoir City Walmart as previously planned.

The surveilling officers also had information about suspicious behavior by the occupants of the RAV4. Ms. Lightfoot observed the two occupants of the RAV4 parked with a view of Ms. Cruze's car and "crunched down" in their seats while one held up a cellphone. She reported this unusual behavior to the LCPD, and it was relayed to the officers on the scene of the operation. Finally, the surveilling officers observed the RAV4 begin to leave the parking lot quickly twenty seconds after the courier left Ms. Cruze's vehicle with the money and was chased by officers. *Wardlow*, 528 U.S. at 124–25 (concluding that "unprovoked flight upon noticing the police" contributed to the officers' reasonable suspicion to stop defendant). While it is not clear from Sergeant Ladd's testimony whether the officers pursuing the courier were in uniform, the timing of the RAV4's immediate departure upon seeing individuals chasing McFarlane indicates that the occupants of the RAV4 were connected to the courier. *See United States v. Martin*, 473 F. App'x 494, 495 (6th Cir. 2012) (officers had reasonable suspicion to stop defendant after an officer responding to the scene saw him running from area where burglar alarm sounded and witnesses saw him emerge from bushes near the targeted house). Viewing the totality of the circumstances leading to the stop, as it must, the Court finds the surveilling officers had reasonable suspicion to stop the RAV4 because of its suspected involvement in the financial exploitation of an elder.

Defendants argue that each of the RAV4's occupants' actions—driving a rental car, driving slowly through a parking lot, coming and going from a parking lot, and using a cellphone

28

in a vehicle—along with their race, are innocent or improper considerations in and of themselves. Yet the undersigned views the circumstances as a whole and must consider them in the context of Ms. Cruze's meeting with the couriers. *United States v. Coker*, 648 F. App'x 541, 545 (6th Cir. 2016) (rejecting a "'divide-and-conquer analysis'" in which the various facts are separated and viewed in isolation); *United States v. Campbell*, 436 F. App'x 518, 524 (6th Cir. 2011) ("Factors that are innocent when considered in isolation may provide the basis for reasonable suspicion when viewed together by an experienced officer." (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). The Court finds the surveilling officers had reasonable suspicion to believe the occupants of the RAV4 were involved in the financial exploitation of an elder, and thus, the stop of the RAV4 comports with the Fourth Amendment.

### C. Arrest of Defendants

Both Defendants also argue that law enforcement lacked probable cause to arrest them at the scene of the stop. Defendant Forrester argues that the collision with the pickup truck was not an aggravated assault and contends that the RAV4 only struck the pickup to avoid being hit by the Altima [Doc. 108 p. 6]. He also argues that he could not have evaded law enforcement because the Altima was an unmarked vehicle without lights and sirens [*Id.*]. Defendant Brown argues that as a passenger in the RAV4, he had no control over the collision with the truck or whether they evaded police [Doc. 107 pp. 6–7].

"A warrantless arrest is constitutionally valid if, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense." *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) (citation

omitted).  Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion."  *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted).  In other words, probable cause means a substantial chance or likelihood of criminal conduct.  *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (citation omitted).  Probable cause is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001).

Aggravated assault is the intentional, knowing, or reckless assault of another involving the use or display of a deadly weapon.  Tenn. Code. Ann. § 39-13-102(a)(1)(A)(iii) & -(B)(iii).  Assault is "intentionally or knowingly caus[ing] another to reasonably fear imminent bodily injury[.]"  Tenn. Code Ann. § 39-13-101.  "A car can constitute a 'deadly weapon' for purposes of the aggravated assault statute."  *United States v. Simpson*, No. 22-5198, 2022 WL 16859532, at *2 (6th Cir. Nov. 7, 2022) (citing *State v. Tate*, 912 S.W.2d 785, 788 (Tenn. 1995)).  "'A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result,' Tenn. Code Ann. § 39-11-302(b), but a person acts only recklessly 'when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur,' Tenn. Code Ann. § 39-11-302(c)."  *Id*.

Defendant Forrester argues that the RAV4 either did not strike the pickup truck or only collided with the truck after the Altima drove directly toward it [Doc. 108 p. 6].  He contends that under either scenario, the surveilling officer's act of driving into his vehicle "negated the required mens rea for aggravated assault under Tennessee law" [*Id*.].  Defendant Forrester's argument is contradicted by the Home Depot security video and Sergeant Ladd's testimony.  The

video shows that the RAV4 stopped several feet away from the pickup truck, which was blocking the RAV4's path forward. The Altima driven by the surveillance team, began to turn into the lane of the parking lot, in front of the truck. Sergeant Ladd testified that the Altima could have made this turn without striking the RAV4. The RAV4 then accelerated into the side of the truck with enough force to bounce backward. Sergeant Ladd testified that the RAV4 did not have to drive into the truck but, instead, could have remained stopped in its lane. After the RAV4 struck the pickup, the Altima drove into the rear passenger side of the RAV4 to prevent it from moving. Based upon the actions of Defendant Forrester driving into the truck, the officers had probable cause to arrest him for aggravated assault.

The Government argues that the officers had probable cause to arrest both occupants of the RAV4 "for evading arrest, committing other state offenses, and for being involved in the conspiracy to defraud Ms. Cruze" [Doc. 118 p. 11].[6] Defendant Forrester maintains that he could not be arrested for evading arrest because the surveillance car that he allegedly evaded was unmarked and did not have lights or a siren [Doc. 108 pp. 6–7]. Defendant Brown argues that he could not be arrested for evading arrest, because he was not in control of the RAV4 [Doc. 107 p. 7]. Both Defendants argue that, at the time of their arrest, law enforcement had no evidence of their involvement with the lottery scheme and or financial exploitation of an elder [Doc. 107 p. 7; Doc. 108 pp. 5, 7; Doc. 121 pp. 3–4]. In support of this argument, Defendant Brown points to

---

[6]     Under Tennessee law, "it is unlawful for any person to intentionally conceal themselves or flee by any means of locomotion from anyone the person knows to be a law enforcement officer if the person . . . [k]nows the officer is attempting to arrest the person[.]" Tenn. Code Ann. § 39-16-603(a)(1)(A). Additionally, "[i]t is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1). For both provisions, the fact that the attempted arrest was unlawful is a defense to prosecution. Tenn. Code Ann. § 39-16-603(a)(2) & -(b)(2). Also, "[i]t is an offense for any person to knowingly financially exploit an elderly or vulnerable adult." Tenn. Code Ann. § 39-15-502(a).

31

Sergeant Ladd's testimony before the Grand Jury that law enforcement determined that Defendants Brown and Forrester were involved in the lottery scheme after the $150,000 was transferred from Ms. Cruze to the couriers" [*Id*. at 3].

The Court finds that at the time they stopped the RAV4, the surveilling officers had probable cause to arrest both occupants for their involvement in the conspiracy to defraud Ms. Cruze. The Court has already found that the officers reasonably suspected that the RAV4 was involved with the courier's meeting to receive the payment from Ms. Cruze. After the transfer of the funds to McFarlane and his flight from law enforcement upon exiting Ms. Cruze's vehicle, the RAV4 immediately left the spot from which it was observing the transaction and began to make its way out of the Home Depot parking lot. When the RAV4 was blocked by a truck in front and was about to be blocked on the side by the Altima, Defendant Forrester accelerated into the truck in an effort to escape the parking lot. The Court finds that when the surveilling officers saw the RAV4 strike the truck in an attempt to avoid apprehension, their reasonable suspicion that the occupants of the RAV4 were involved in the lottery scheme ripened into probable cause. *See United States v. Dotson*, 49 F.3d 227, 230 (6th Cir. 1995) (determining that defendant's unprovoked flight at the sight of "civilian-clad individuals in unmarked vehicles" caused the officers' reasonable suspicion that defendant was involved in money laundering to ripen into probable cause); *see also United States v. Williams*, 475 F. App'x 36, 39–40 (6th Cir. 2012) ("[I]f officers have reasonable suspicion that an individual has committed or is committing a crime, and when approached by officers the individual flees or attempts to flee, the reasonable suspicion 'ripens' into probable cause." (citing *Dotson*, 49 F.3d at 230–31)).

In *Dotson*, the court acknowledged the legitimacy of defendant's argument that he fled apprehension by individuals not identifiable as law enforcement; however, it reasoned that the

court "do[es] not evaluate the subjective reasonableness of [defendant's] actions, but the objective reasonableness of the arresting officer's actions." 49 F.3d at 230. Here, when the RAV4 accelerated into the truck, an act which the surveilling officers reasonably interpreted as the RAV4's attempt to flee apprehension, the officers had reasonable grounds to believe that the occupants of the RAV4 were involved in the financial exploitation of Ms. Cruze, an elder. Accordingly, the Court finds that law enforcement properly arrested both Defendants.

### D. Seizure of the Cellphones

Defendant Brown argues that if his arrest was unlawful, the Court must suppress the evidence from his cellphone which was seized from his person incident to his arrest. The Court finds, however, that the only evidence before it shows the cellphones were seized from the RAV4. Sergeant Ladd testified that she was not present when officers stopped the RAV4 and arrested Defendants Forrester and Brown. She stated that she did not know where the cellphones were located when they were seized.

Defendant Brown acknowledges that "it is unclear whether [his] phone was found on his person or in the vehicle by the testimony in the record" [Doc. 121 p. 4]. He argues that the affidavit in support of the search warrant for the contents of the cellphones states that his cellphone, which is green, was found "in his possession" [*Id*.].[7] However, this affidavit was not placed into evidence. Instead, the Court looks to the affidavit of United States Postal Inspector John Wallace Bowden, offered in support of the Criminal Complaint [Doc. 1]. Inspector Bowden's affidavit states that "[w]hile the [RAV4] had been under surveillance earlier, agents

---

[7]     The Court finds that if Defendant Brown's cellphone was on his person at the time of his arrest, it was properly seized incident to his arrest. *United States v. Kaye*, 492 F.2d 744, 746 (6th Cir. 1974) ("Incident to making a lawful custodial arrest, a full search of the person may be made without a warrant.").

saw that the passenger of the vehicle was using a white cellular telephone, which was taken from the vehicle at the time of his arrest" [Doc. 1 ¶ 15].[8]

Sergeant Ladd testified that the surveilling officers and Ms. Lightfoot (the victim's daughter-in-law) saw the passenger of the RAV4 using a cellphone while coming and going and while parked in the lower parking lot at Home Depot. As a result, the officers reasonably believed that the cellphones contained evidence of and/or were instrumentalities of the lottery scheme. "[C]ircumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 335 (2009). The Court finds that at the time Defendants Forrester and Brown were arrested, the arresting officers could search the RAV4 and seize the cellphones, which were evidence of the financial exploitation of an elder.[9] Accordingly, law enforcement properly seized the cellphones in this case.

---

[8] This same statement appears in Inspector Bowden's affidavit supporting the Criminal Complaint for Tessa Hines [Doc. 1, Criminal Complaint from Feb. 23, 2022, ¶ 27]. The Court notes that the Criminal Complaint for Defendant Hines was merged into this case from case number 3:22-MJ-2045 and retained its document number from that case, even though there was already a document number one in this case.

[9] The Government also argues that the officers could have properly seized the cellphones during an inventory search of the RAV4 [Doc. 118 p. 5]. "An inventory search is a recognized exception to the Fourth Amendment's warrant requirement: where the police are in lawful custody of a vehicle, they may conduct an inventory search to catalogue its contents pursuant to standardized criteria." *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020) (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990); *Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987)). An inventory search must be executed pursuant to routine law enforcement procedures and may not be performed for the purpose of investigation. *United States v. Snoddy*, 976 F.3d 630, 634 (6th Cir. 2020); *Alexander*, 954 F.3d at 916. Here, the Government did not introduce the LCPD's inventory procedures so that the Court cannot determine whether the cellphones were properly seized pursuant to an inventory search.

## IV.    CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the undersigned finds that law enforcement had reasonable suspicion to stop the Defendants' vehicle and that the officers had probable cause to arrest Defendant Forrester for aggravated assault and probable cause to arrest both Defendants for financial exploitation of an elder.  Finally, the undersigned finds that the officers properly searched the RAV4 incident to the Defendants' arrest and seized the cellphones as evidence of the financial exploitation of an elder. Accordingly, the undersigned respectfully **RECOMMENDS** that that Defendants' Motions to Suppress [**Docs. 87 & 89**] be denied.[10]

Respectfully submitted,

Debra C. Poplin
United States Magistrate Judge

---

[10]    Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

35